# Supreme Court of Texas

No. 22-0169

Mike Morath, Commissioner of Education for the State of Texas;
Bellpas, Inc.; and Copperas Cove Independent School District,

*Petitioners*,

v.

Lampasas Independent School District,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued October 3, 2023**

JUSTICE DEVINE delivered the opinion of the Court.

When a party presents a petition to detach real property from one school district and annex it to another, the Texas Education Code places a duty on both school boards to hold a hearing, make findings, and adopt a resolution approving or disapproving the petition.[1]  Each board is free to give an up or down vote after considering various factors, and if they

---

[1] TEX. EDUC. CODE § 13.051(g)–(h).

agree on the disposition, the decision is final.[2]   But if the boards disagree, the Commissioner of Education can settle the matter in a de novo administrative appeal.[3]

In this case, one school board held a hearing and approved the petition in short order.  But in a classic case of stonewalling,[4] the other school board has spent more than seven years fighting its statutory duty to answer one way or the other.  The issue we must decide today is whether the requisite disagreement between the school boards is lacking, depriving the Commissioner of jurisdiction over the petitioner's administrative appeal.  While the court of appeals held that persistent, long-term, and unexplained inaction is not equivalent to "disapprov[al]" under the Commissioner's enabling statute,[5] we disagree.

We hold that the Commissioner had jurisdiction because, under a plain reading of the Education Code, a board "disapproves" a petition by not approving it within a reasonable time after a hearing.  We further hold that the Commissioner did not lose jurisdiction by failing to issue a ruling within 180 days.  While the statute imposes such a deadline on the Commissioner, it is not jurisdictional.[6]  The statute is directed to providing a final resolution on the merits, not thwarting one.  To hold that a ruling on the petition may be stalled indefinitely or otherwise

---

[2] *Id.* § 13.051(h)–(j).

[3] *Id.* § 13.051(j).

[4] *Stonewall*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010) ("delay or block (a request, process, or person) by refusing to answer questions or by giving evasive replies, esp. in politics").

[5] 644 S.W.3d 866, 867, 871 (Tex. App.—Austin 2022).

[6] TEX. EDUC. CODE §§ 7.057(b), 13.051(j).  *But see infra* note 70.

2

prevented by the inaction or unwarranted delay of either governmental actor would be repugnant to the statutory scheme. Finding no jurisdictional infirmity, we reverse the court of appeals' judgment and remand the case to that court to resolve the appeal on the merits.

## I. Background

Bellpas, Inc., a land development company, intends to develop property for a residential community at the east end of Lampasas Independent School District (LISD). Because LISD's middle and high schools are located almost twenty miles away, homebuilders have expressed disinterest in the property. In contrast, the schools of the bordering Copperas Cove Independent School District (CCISD) are within six miles, which is more commercially desirable. To satisfy the homebuilders' concerns, Bellpas seeks to detach the property from LISD and annex it to CCISD under Section 13.051 of the Education Code. Otherwise, Bellpas asserts, the property will remain undeveloped for the foreseeable future.

## A. School Board Proceedings

To detach and annex property, a party must first present a petition to the board of trustees of each affected school district.[7] The petition requirements are minimal: it must simply "give the metes and bounds" of the affected territory and be signed by a majority of the registered voters residing in the territory or, if there are no residents, the surface owners.[8]

---

[7] *See* TEX. EDUC. CODE § 13.051(a).

[8] *Id.* § 13.051(b).

3

In December 2015, Bellpas, the property's sole surface owner, presented petitions to the LISD and CCISD boards. The nearly identical petitions described the property, its taxable value, and the social, economic, and educational effects of the proposed detachment and annexation.[9] Of special note for this case, the first paragraph of the petitions stated that the "Affected Territory" "consists of 348.55 acres of land more particularly shown and described by metes and bounds in Exhibit A." A map and three pages of field notes, attached as Exhibit A, identified the total acreage as "348.55" and described the territory through landmarks, courses, points, angles, distances, and references to recorded deeds and plats.

The next month, Bellpas decided to carve out 12.72 acres for immediate development, which necessitated the presentment of an amended petition to each school board. To that end, Bellpas revised the map and field notes to reflect that change in the territory's description and to identify the new total acreage as "335.83." Bellpas also revised the first paragraph of each amended petition to direct the respective school boards to the new map and field notes, now attached as "Appendix A," by describing the "Affected Territory" as "more particularly shown and described by metes and bounds in Appendix A." There was, however, one difference that LISD contends is pivotal to its entire case: while the first paragraph in the amended petition to CCISD correctly stated that the new total acreage shown and described in Appendix A

---

[9] Although the original LISD petition is included in the record, the original CCISD petition is not. The Commissioner, however, found that the original petitions "are identical" except for the address line, and LISD does not dispute this characterization.

4

"consists of 335.83 acres," Bellpas failed to make a conforming change to the first paragraph in the amended petition to LISD. That petition continued to list "348.55" as the total acreage, despite the modifications to the affected territory's description in Appendix A.[10] Bellpas's president later testified that this was an "overlooked" typographical error, which Bellpas did not discover—and LISD did not identify—before the administrative appeal to the Commissioner.

On February 1, 2016, LISD held a hearing on the amended petition. CCISD's hearing occurred a few months later. "After the conclusion of the hearing," each board "shall make findings" as to the students' educational interests and the "social, economic, and educational effects of the proposed boundary change" and "adopt a resolution approving or disapproving the petition."[11] The CCISD board promptly approved Bellpas's petition after its hearing, but the LISD board took the petition "under advisement." This placed Bellpas in an apparent limbo: although Section 13.051(j) authorizes a de novo appeal to the Commissioner "under Section 7.057" if only one board "disapproves the petition,"[12] it does not explicitly address what happens when one board approves the petition and the other takes no action.

Despite Bellpas's repeated requests to secure a decision, the LISD board continued to refrain from an up or down vote on the petition. In May, Bellpas sent LISD the CCISD resolution and requested a ruling

---

[10] The two amended petitions, which were both included in the record, also varied in their address lines and were signed by different notaries.

[11] *Id.* § 13.051(h).

[12] *Id.* § 13.051(j).

but received no response. Bellpas renewed its request in August, stating that it would take "legal steps" to compel compliance with Section 13.051 if "the board has not acted after the regular meeting in September." LISD's counsel replied that he believed the board would "take it up at the September meeting." Although the petition was listed as an item on that meeting's posted agenda, the LISD board took no action on it.

When the matter was again bypassed the following month, Bellpas attempted to secure declaratory and mandamus relief from the courts in a suit against LISD's trustees in their official capacities. Instead of adopting a resolution at one of their scheduled board meetings, which would have mooted the lawsuit, the trustees pursued a dilatory tactic of challenging the court's jurisdiction on the basis that Bellpas failed to exhaust its administrative remedies by filing a local grievance with the school district. Bellpas reports that after a hearing, the trial judge stated his reluctance to compel the trustees to adopt a resolution before exhaustion. On Bellpas's motion, the trial court abated the case in April 2017 pending the conclusion of the grievance process. But when Bellpas promptly filed a grievance, LISD's superintendent dismissed it as untimely, and the LISD board affirmed the dismissal. The superintendent explained that because Bellpas's grievance complained of "the same subject matter" as the abated lawsuit, Bellpas had not filed its grievance within fifteen days from when it first "knew or should have known of the decision giving rise to the action," as required by LISD's grievance policy.

By then, it was June 2017 and more than sixteen months had passed since the LISD hearing on Bellpas's amended petition. In the interim, the board had conducted multiple meetings with the petition

6

listed as an agenda item without taking any action on it, despite Bellpas's concerted effort to get a resolution through direct requests, a legal action, and a grievance proceeding. All the while, LISD provided no explanation to Bellpas for the school board's protracted inaction.

## B. Administrative Appeal

On June 6, 2017—the day after the LISD board affirmed the dismissal of the grievance—Bellpas appealed to the Commissioner of Education and requested a de novo hearing. Bellpas alleged that the Commissioner had jurisdiction under Section 13.051(j) of the Education Code because of "LISD's constructive denial" of its petition. The Commissioner appointed an administrative law judge (ALJ) to hear the case, and CCISD later intervened.

The proceedings were "hotly contested" with frequent jurisdictional and discovery disputes. In a plea to the jurisdiction and motion to dismiss, LISD again asserted that Bellpas had not exhausted its administrative remedies. This time, however, LISD argued that Bellpas had no recourse to the Commissioner because the local grievance had been untimely. The ALJ rejected this argument because Bellpas was appealing from the board's denial of its detachment-and-annexation petition, which did not require a local grievance. And in an order denying the plea and motion, the ALJ determined that the LISD board had constructively disapproved Bellpas's petition by failing to adopt a resolution within a reasonable time after the hearing.

LISD moved for reconsideration on two grounds. One, the statute does not impose a deadline to adopt a resolution; rather, a decision merely must be "'after the conclusion of the hearing,' meaning *not before*." And two, the ALJ determined that a reasonable time had passed

7

"with no actual evidence before him." The ALJ withdrew the order in September 2017 for the limited purpose of allowing LISD to present evidence as to the reasonableness of its inaction at a hearing. The next day, Bellpas and LISD jointly moved to amend the scheduling order to set a January 2018 hearing and to extend the final-decision deadline to April 6, 2018, because "additional time is needed to conduct discovery, depose witnesses, and otherwise prepare for hearing."

When January 2018 rolled around, however, LISD raised two new "additional grounds for dismissal." First, LISD argued that the Commissioner's jurisdiction had already expired the previous month because, under Sections 7.057(b) and 13.051(j) of the Education Code, he "shall" hold a hearing and issue a decision "not later than the 180th day" after the filing of the administrative appeal.[13] Second, LISD claimed that the CCISD and LISD boards did not consider the *same* petition because of the total-acreage discrepancy in the amended petitions' first paragraphs. In other words, there was no "split decision" on the same petition as necessary to provide the Commissioner with jurisdiction under Section 13.051(j).[14]

That same month, Bellpas moved for sanctions against LISD for failure to comply with an earlier discovery order. The ALJ again ordered discovery and rescheduled the merits hearing for a later date. After LISD again failed to produce the requisite discovery, Bellpas renewed its motion, and the ALJ concluded that LISD had now "flagrantly and

---

[13] *Id.* §§ 7.057(b), 13.051(j). *But see infra* note 70.

[14] *See Marble Falls Indep. Sch. Dist. v. Scott*, 275 S.W.3d 558, 563 (Tex. App.—Austin 2008, pet. denied) (describing a Section 13.051(j) appeal as from a "split decision").

obstinately failed to comply with discovery orders," "significantly harm[ing]" Bellpas's ability to present its case. As a sanction, the ALJ deemed the social and educational factors (but not the economic factor) as "strongly favor[ing] the boundary change" and noted that a hearing would be held as to the remaining jurisdictional and merits issues.

That hearing occurred in September 2018, more than a year after Bellpas filed its administrative appeal. As a preliminary matter, LISD objected to the hearing being conducted after the 180-day statutory deadline. But the ALJ overruled that objection after Bellpas asserted that the "deadline is directory and not mandatory." The ALJ also confirmed that the remaining issues were limited to the economic impact of the detachment and annexation and any evidence LISD "ha[d] to offer about the reasonableness of the school district having delayed action on this local petition for what is now coming on three years." But when the ALJ asked why LISD had never acted on the amended petition, LISD did not present any evidence on the matter. Instead, counsel demurred: "I don't want to go outside the record, your Honor. I mean, that's the intent of the board." In April 2019, the ALJ issued his proposal for decision, recommending that the detachment and annexation be approved.

In June 2019, two years after Bellpas filed its administrative appeal, the Commissioner issued his final decision, approving the detachment and annexation. As relevant to the jurisdictional issues here, the Commissioner found and concluded:

- "When a statute requires an action to be done, but does not set a timeline, a reasonable timeline is presumed."

9

- What is a reasonable time depends "on the particular case," but "in many cases," it "will be the next regularly scheduled meeting or at least the second regularly scheduled meeting, barring extraordinary situations."

- A school district that "obstinately refuses" to adopt findings and issue a resolution has shown that providing an opportunity to do so would "be futile."

- The amended petitions to LISD and CCISD are "functionally identical" and "essentially the same," notwithstanding one typographical error misstating the total acreage.

- The LISD board "will be deemed to [have] disapprove[d] the petition" because it did not adopt a resolution within a reasonable time after the hearing, has provided no credible explanation as to why not, and has acted "in order to thwart the proposed detachment and annexation."

### C. Judicial Review

In a suit for judicial review,[15] LISD contested the Commissioner's jurisdiction and challenged the decision's validity on procedural and merits grounds. The trial court affirmed, but the court of appeals vacated the judgment and dismissed the cause. The court of appeals first noted that Section 7.057(a)(2) of the Education Code authorizes an appeal "when a person is aggrieved by 'actions or decisions' of a school district board of trustees that violate Texas school laws" and construed the "actions or decisions" requirement to apply to an appeal under Section 13.051(j).[16] The court then held that there was no predicate "act or decision" by the LISD board for the Commissioner to exercise his

---

[15] *See* TEX. EDUC. CODE § 7.057(d) (providing for judicial review).

[16] 644 S.W.3d 866, 867, 870-71 (Tex. App.—Austin 2022).

jurisdiction and the argument that "'inaction is the action' triggering the Commissioner's jurisdiction under section 7.057 is unsupported by the plain and unambiguous language of the statutory text."[17]

Bellpas, CCISD, and the Commissioner petitioned this Court for review, arguing that the court of appeals conflated the general requirements for an appeal under Section 7.057(a) with the more specific requirements for an appeal under Section 13.051(j). As to Section 13.051(j), the petitioners contest LISD's statutory construction that would allow one board to effectively hold a veto and "block the detachment/annexation process by inaction." Bellpas and CCISD invoke the absurdity doctrine while the Commissioner claims that LISD's construction is inconsistent with Section 13.051(j)'s language, which requires only disapproval, not disapproval by resolution. The Commissioner also asserts that the amended petitions for detachment and annexation are functionally identical because the metes-and-bounds description attached as Appendix A controls over the misstated total acreage in the first paragraph.

LISD agrees that Section 13.051(j) provides the "gateway" to a detachment-and-annexation appeal and that any "broader holding about the meanings of the words 'actions or decisions'" under Section 7.057(a) "was both unnecessary and irrelevant to the [court of appeals'] decision." But LISD argues that (1) a board of trustees *must affirmatively act* to disapprove a petition for detachment and annexation, which its board did not do; (2) the Legislature did not impose a deadline to adopt a resolution and the Commissioner does not

---

[17] *Id.* at 871.

11

have the authority to create a "reasonable time" deadline; and (3) because the amended petitions state different total acreages, there was no "split decision." Alternatively, LISD asserts that the Commissioner lost jurisdiction by failing to issue a decision within Section 7.057(b)'s 180-day deadline. Finally, LISD claims that if the dismissal is not affirmed, the Commissioner's decision must be reversed on various procedural and merits grounds not reached by the court of appeals.

We granted the petitions to consider the jurisdictional issues the parties have raised.

## II. Discussion

The parties' jurisdictional dispute presents issues of statutory interpretation, which we consider de novo.[18] In construing statutory text, our primary objective is to ascertain and give effect to the Legislature's intent.[19] In doing so, we look to the plain meaning of the statutory terms, informed by context, as the most reliable guide to the Legislature's intent.[20]

### A. Sections 7.057(a) and 13.051(j)

We begin by considering whether an appeal under Section 13.051(j) must also satisfy Section 7.057(a)'s requirements. Both sections authorize appeals to the Commissioner. Section 7.057(a) provides that aggrieved persons "may appeal" to the Commissioner on

---

[18] *Davis v. Morath*, 624 S.W.3d 215, 221 (Tex. 2021).

[19] *Broadway Nat'l Bank v. Yates Energy Corp.*, 631 S.W.3d 16, 23 (Tex. 2021).

[20] *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022).

12

broad grounds, including when a board's "actions or decisions" violate the "school laws of this state."[21] When the appeal is "against a school district," the Commissioner's decision is "based on a review of the record developed at the district level under a substantial evidence standard of review."[22] Section 13.051(j), in contrast, authorizes a "de novo" appeal in the following specified circumstance: "If the board of trustees of only one affected district *disapproves the petition*, an aggrieved party to the proceedings in either district may appeal the board's decision to the commissioner under Section 7.057."[23]

Sections 7.057(a) and 13.051(j) each provide independent grounds for an appeal against a school district with different standards of review. Although Bellpas conceivably could have appealed the LISD board's inaction to the Commissioner as an alleged violation of school laws under a substantial-evidence standard of review,[24] it instead sought a de novo appeal under Section 13.051(j).[25] To the extent the court of appeals imported Section 7.057(a)'s requirements for an appeal under Section 13.051(j), it erred. Thus, the crux of the parties' dispute is not whether "'inaction is the action' triggering the Commissioner's

---

[21] TEX. EDUC. CODE § 7.057(a)(2)(A).

[22] *Id.* § 7.057(c).

[23] *Id.* § 13.051(j) (emphasis added).

[24] *See id.* §§ 7.057(a)(2)(A), (c), 13.051(h). *But see Davis v. Morath*, 624 S.W.3d 215, 223 n.7 (Tex. 2021) (noting the hypothetical argument that parties could not "appeal" under Section 7.057(a) for "actions or decisions" in violation of school laws "without having obtained a decision from the school district at all").

[25] *See Davis*, 624 S.W.3d at 225 (noting that administrative complainants "are entitled to frame their own grievance").

jurisdiction under section 7.057,"[26] as the court of appeals framed it, but whether the LISD board "disapprove[d]" Bellpas's petition as required for the Commissioner's jurisdiction over an appeal under Section 13.051(j).

## B. The Plain Meaning of "Disapproves"

To ascertain the meaning of an undefined term like "disapproves," we generally consult dictionaries for the term's commonly understood meaning.[27]  Dictionaries define "disapprove" as "to pass unfavorable judgment upon" or "to refuse approval to."[28]  Along these lines, LISD argues that a board "must act" to disapprove a petition.  But the term need not be so limited; it is also defined as "to withhold approval from," which does not require action.[29]  Even "to refuse approval to" contemplates disapproval that can be shown.[30]  And disapproval can be shown through inaction when action otherwise would be called for.[31]

---

[26] 644 S.W.3d 866, 871 (Tex. App.—Austin 2022).

[27] *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017).

[28] *Disapprove*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002); *see Disapprove*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016) ("To have an unfavorable opinion of; condemn"; "To refuse to approve; reject").

[29] *Disapprove*, THE RANDOM HOUSE DICTIONARY (2d ed. 1987).

[30] *See Refuse*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("to show . . . unwillingness to do or comply with"); *Belin v. Reynolds*, 989 N.W.2d 166, 174 (Iowa 2023) ("[D]ictionaries confirm that a 'refusal' can either be stated or *shown*.").

[31] *See Belin*, 989 N.W.2d at 174 (collecting examples and noting that "refusal can also be *implied*" and that "[t]he idea of a 'silent refusal' is not foreign to English speakers"); *cf. Silent Treatment*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("an act of completely ignoring a person or

14

Everyday life confirms this: disapproval may be expressed, for example, by leaving no tip at a restaurant after being served or by sitting silently while everyone else is applauding at the end of a concert.

Courts, however, must be cautious in relying on acontextual definitions.[32] Although text should not be stretched "beyond its permissible meaning,"[33] its scope should not be restricted without reason to less than the plain language can bear.[34] Context delineates the contours of a term's scope.[35] Here, Section 13.051(j) omits any reference to "resolution" and does not require disapproval *by resolution* for the Commissioner to exercise his jurisdiction over an appeal.[36] And because an appeal is de novo, the lack of findings and a resolution is no hindrance to the Commissioner's consideration. Although in practice, disapproval usually would occur by resolution, subsection (j)'s text does

thing by resort to silence esp. as a means of expressing contempt or disapproval").

[32] *McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 920 (Tex. 2023) ("Words in a vacuum mean nothing. Only in the context . . . can the true meaning of a single provision be made clear.").

[33] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 85 (Tex. 2017).

[34] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 572 (Tex. 2016) ("Our primary objective . . . is to ascertain and effectuate the Legislature's intent without unduly restricting or expanding the statute's scope.").

[35] *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) ("'Context,' after all, 'is a primary determinant of meaning.'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, at 167 (2012))).

[36] *See In re D.S.*, 602 S.W.3d 504, 514 (Tex. 2020) ("[W]e assume the Legislature chose statutory language with care, included each chosen word for a purpose, and purposefully omitted all other words.").

not contextually constrain "disapproves" to narrowly refer only to disapproval by formal resolution. In other words, consistent with the plain meaning of "disapproves," a board disapproves a petition by inaction if action approving the petition would otherwise be called for.

## C. An Implicit Reasonable Time Standard

Section 13.051(h) provides:

> *After the conclusion of the hearing*, each board of trustees shall make findings as to the educational interests of the current students residing or future students expected to reside in the affected territory and in the affected districts and as to the social, economic, and educational effects of the proposed boundary change and *shall*, on the basis of those findings, *adopt a resolution approving or disapproving the petition*.[37]

According to the Commissioner, action to approve a petition by resolution is called for within a reasonable time after a hearing. LISD responds that the statute is silent as to a required time for performance and only the Legislature can impose such a deadline. In the administrative proceedings, LISD's counsel even asserted that it would not violate the law to wait a hundred years after a hearing before making findings and adopting a resolution.

We agree with the Commissioner and conclude that the Legislature intended the board's duty to be performed within a reasonable time. Our holding does not mean that the Legislature intended courts to enforce consequences for noncompliance with this

---

[37] TEX. EDUC. CODE § 13.051(h) (emphases added).

16

implicit time standard, which would require a distinct analysis.[38]  But here, we are interpreting a statute to determine the meaning of "disapproves," not crafting a judicially enforceable consequence for noncompliance with an implied deadline.

To our knowledge, we have never considered whether a statute that imposes no express deadline implies a reasonable time to perform a statutory duty.  But we have concluded that parties must execute statutory rights or contractual obligations within a reasonable time when the text is otherwise silent.[39]  And high courts of our sister states have applied a well-recognized rule requiring performance within a reasonable time when a statute imposes a duty but is silent as to when it must be carried out,[40] especially when the statute charges a public

---

[38] *See In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 295-97 (Tex. 2022).

[39] *See, e.g.*, *Westheimer Indep. Sch. Dist. v. Brockette*, 567 S.W.2d 780, 789 (Tex. 1978) (statutory right to appeal); *Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957) (contractual obligation); *cf. Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239 (Tex. 2016) (noting that courts may imply terms "that can reasonably be implied" in agreements to avoid forfeitures); *Austin Co. v. Vaughn Bldg. Corp.*, 643 S.W.2d 113, 115 (Tex. 1982) (holding that the law implies a reasonable time limit for an owner to give written notice of defects when an express warranty does not specify a deadline); *Countz v. Mitchell*, 38 S.W.2d 770, 774 (Tex. [Comm'n Op.] 1931) ("It also appears that the Legislature has failed to fix the length of time for giving notice of such an election.  In the absence of such provision, we think the law implies there must be a reasonable time.").

[40] *See Belin v. Reynolds*, 989 N.W.2d 166, 174 (Iowa 2023) ("If a statute imposes a duty but is silent as to when it is to be performed, a reasonable time is implied." (quoting 2B SUTHERLAND STATUTORY CONSTRUCTION § 55:3 (7th ed. 2012))); *accord In re Adoption of B.B.*, 417 P.3d 1, 25 (Utah 2017); *Trivectra v. Ushijima*, 144 P.3d 1, 19 (Haw. 2006); *The Jewish Home for the Elderly of Fairfield Cnty., Inc. v. Cantore*, 778 A.2d 93, 99 (Conn. 2001); *In re Edwards*, 130 So. 615, 617 (Fla. 1930); *Leigh v. Green*, 86 N.W. 1093, 1095 (Neb. 1901).

officer with a public duty.[41]  Although we do not adopt this rule as a general presumption of legislative intent today, we conclude that this statutory scheme's text and context—including its evident purpose—fairly implies a reasonable time standard.[42]

Specifically, this standard is objectively implicit in the statutory requirements that a board "shall" both adopt a resolution "[a]fter" the hearing and "carry out" its "duties as provided by the code."[43]  To construe "shall . . . adopt a resolution" as imposing a duty that could be indefinitely delayed after a hearing would effectively neuter the obligation, impose no duty to "carry [it] out" at all, and frustrate the statute's purpose.[44]  The statute permits local boards to decide the issue

---

[41] *See McDeid v. Johnston*, 984 N.W.2d 864, 877 (Minn. 2023) ("It is a well recognized rule that when a public officer is called upon to perform a public duty by statute and no time is specified for the performance of the act, it is required that the act be performed within a reasonable time." (quoting *State ex rel. Laurisch v. Pohl*, 8 N.W.2d 227, 231 (Minn. 1943))); *accord State Bd. of Tax Comm'rs v. L.H. Carbide Corp.*, 702 N.E.2d 706, 707 (Ind. 1998); *Bd. of Supervisors of King & Queen Cnty. v. King Land Corp.*, 380 S.E.2d 895, 898 (Va. 1989); *Dearborn v. Town of Milford*, 411 A.2d 1132, 1134 (N.H. 1980); *E. Iowa Cablevision, Inc. v. City of Iowa City*, 272 N.W.2d 413, 417 (Iowa 1978); *Brink v. Curless*, 209 N.W.2d 758, 769 (N.D. 1973); 67 C.J.S. *Officers* § 346 (2023); 63C AM. JUR. 2d *Public Officers and Employees* § 228 (2024).

[42] *See* Scalia & Garner, *supra* note 35, at 16 ("Textualism, in its purest form, begins and ends with what the text says and fairly implies."), 33 (a text's purpose, as "gathered" from the text itself, "is a vital part of its context"), and 167 ("Context is a primary determinant of meaning.").

[43] TEX. EDUC. CODE §§ 11.1511(b)(15), 13.051(h); *see Carry Out*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("to put into execution"; "to bring to a successful issue"; "to continue to an end or stopping point").

[44] *See* TEX. GOV'T CODE § 311.021(2)–(4) (stating presumptions that in enacting a statute, the Legislature intended a just and reasonable result, a result feasible of execution, and the entire statute to be effective); *S. Taylor Cnty. Indep. Sch. Dist. v. Winters Indep. Sch. Dist.*, 249 S.W.2d 1010, 1012

18

without the Commissioner substituting his judgment for theirs when they lawfully concur, but it also provides for disagreement between boards to be resolved through an administrative appeal procedure with the Commissioner.[45] LISD's construction would create an atextual option that gives one board a unilateral veto (through extended delay) over a proposed detachment and annexation without review, contrary to the statute's structure and design.[46] In context, the mandatory directive "shall" with the temporal indicator "[a]fter" fairly implies that a board must act on the petition within a certain time that would promote orderly conduct towards resolving the proceedings.[47]

In our view, construing the statute's implicit time period for action to permit unreasonable or indefinite delay after the hearing is

---

(Tex. 1952) (annexation law should "not be given a construction that would thwart [its] purposes"); *cf. Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017) (inferring a reasonable time standard for districts to refer disabled children for evaluations because otherwise they would be "perverse[ly] incentiv[ized]" not to comply to "stall accrual" of obligations); *Hotze v. Turner*, 672 S.W.3d 380, 388 (Tex. 2023) (relying on Section 311.021's presumptions to reject an interpretation that would "permit a municipality to indefinitely delay giving effect to an amendment").

[45] *See* TEX. EDUC. CODE §§ 11.151(b), 13.051(i), (j).

[46] *Cf. Minella v. City of San Antonio*, 437 F.3d 438, 441 (5th Cir. 2005) (rejecting an interpretation of Section 9.005(b) of the Texas Local Government Code that would provide the city council with discretion to determine an amendment's effective date because it "would allow a city council to effectively 'veto' a voter adopted amendment by delaying its implementation").

[47] *Cf. State ex rel. Berger v. McCarthy*, 548 P.2d 1158, 1160 (Ariz. 1976) ("The Legislature's use of the word 'shall' necessarily included a directive that it be performed within a time period which would promote prompt and orderly conduct of the proceedings." (citing *Chisholm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956))).

patently unreasonable.[48]  "Context also includes common sense,"[49] and the "notion that some things 'go without saying' applies to legislation just as it does to everyday life."[50]  Consider a mother who tells her child, "*After* dinner, you *shall* clean your room," and the father says, "Make sure to *carry out* what she told you to do."  Although waiting a week, a year, or even a hundred years after dinner to clean the room would comply with a hyperliteral interpretation of "after," it would defy a reasonable understanding of the parental commands' fair meaning.[51]  Objectively implicit is the requirement that the job will be done in a reasonable time.  Perhaps not immediately or at a precise time "after" dinner: homework or a tv show might occur first or an emergency may

---

[48] *See Worsdale v. City of Killeen*, 578 S.W.3d 57, 73-74 (Tex. 2019) ("[A]ffording the statute an unreasonable meaning runs counter to bedrock statutory construction principles and is inconsistent with 'a realistic assessment of what the legislature ought to have meant.'" (quoting Scalia & Garner, *supra* note 35, at 252)).

[49] *Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring).

[50] *Id.* (quoting *Bond v. United States*, 572 U.S. 844, 857 (2014)); *see* Scalia & Garner, *supra* note 35, at 96 ("The omitted-case canon . . . must sometimes be reconciled with the principle that a text does include not only what is express but also what is implicit.").

[51] *See* Scalia & Garner, *supra* note 35, at 356 ("Adhering to the *fair meaning* of the text . . . does not limit one to the hyperliteral meaning of each word in the text."); *see also Worsdale*, 578 S.W.3d at 74 n.111 ("Judges must navigate a narrow course between a sterile literalism which loses sight of the forest for the trees, and a proper scruple against imputing meanings for which the words give no warrant." (quoting *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 572 (Tex. 2014) (Willett, J., concurring))).

require further delay. But what "goes without saying" is that any delay would not be unreasonable.[52] So too here.

The Commissioner concluded that a reasonable time depends "on the particular case," but "in many cases" it "will be the next regularly scheduled meeting or at least the second regularly scheduled meeting, barring extraordinary situations." We need not determine whether the Commissioner properly characterized what generally constitutes a "reasonable time" because the LISD board far exceeded that boundary line.[53] Sixteen months of unexplained inaction—during which multiple board meetings occurred with Bellpas's petition as a scheduled item—is indisputably unreasonable.[54]

---

[52] *Cf. Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957) (noting that it is "in accord with human experience" to assume parties intended a reasonable time when they "omit an express stipulation as to time").

[53] Although we do not specify the precise contours of a "reasonable time" in this case, best practices for a party contemplating an appeal to the Commissioner based on a board's inaction would include notifying the board so that it can either provide a reason for its delay or promptly adopt a resolution. Here, Bellpas twice requested the board to rule after the hearing on its petition and provided notice that it would take legal action if the board did not act.

[54] By interpreting the statute to permit an appeal to the Commissioner when one board "disapproves" a petition through unreasonable inaction, we do not diminish the importance of local decision-making. *See Gilder v. Meno*, 926 S.W.2d 357, 360 (Tex. App.—Austin 1996, writ denied) (acknowledging "the practical problems of preserving local decision-making while still providing for an appeal to a state administrative body"). If a board that has not expressly acted on a petition wants to concur with the other board's action, we see no reason why it could not, in good faith, request an abatement of the administrative appeal to allow that board to make findings and adopt a concurring resolution, thereby mooting the administrative appeal. But abatement is unwarranted if the board merely desires to make its disagreement with the other board's action express after it has already "disapprove[d]" of the petition through inaction. If the school districts are at a stalemate as to the disposition of a petition, the statute affords no deference to

No doubt, a reasonable-time-to-perform standard cannot provide the predictability of a clear, bright-line rule.[55] Our jurisprudence favors bright-line jurisdictional rules to help ensure that "judges and litigants will not waste their resources" determining jurisdiction.[56] But the inability to provide a bright-line rule does not give rise to a jurisdictional impediment here.[57] In construing a statute, our objective is always—and only—to ascertain and give effect to the Legislature's intent, as both

---

the findings and resolutions of either school board, so abating the administrative appeal would serve no purpose besides further delay. And there is no prejudice to the school districts because each has an opportunity to present its position and evidence for the Commissioner's de novo consideration.

[55] *See In re Chavez*, 62 S.W.3d 225, 228-29 (Tex. App.—Amarillo 2001, orig. proceeding) ("[N]o bright-line demarcates the boundaries of a reasonable time period."); Scalia & Garner, *supra* note 35, at 32-33 (noting that terms like "reasonable time" are often used "to cover a multitude of situations that cannot practicably be spelled out in detail or even foreseen").

[56] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 549 (1995) (Thomas, J., concurring); *see United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 637 (Tex. 2023) ("We should strive throughout the law for easily administrable bright-line rules, which can be followed by parties with confidence and applied by judges with predictability.").

[57] A reasonable time standard is not foreign to jurisdictional contexts. *See, e.g.*, *Tex. S. Univ. v. Young*, ___ S.W.3d ___, 2023 WL 6772144, at *3 (Tex. Oct. 13, 2023) (Young, J., concurring in denial) (noting the jurisdictional-fact issue of whether a complaint was provided to a law enforcement officer within a reasonable time (citing TEX. GOV'T CODE § 614.023(a), (b))); *City of Grapevine v. Sipes*, 195 S.W.3d 689, 690 (Tex. 2006) (noting that whether a governmental unit corrected the absence of a traffic signal "within a reasonable time" after notice determines if immunity, which implicates subject-matter jurisdiction, is waived (citing TEX. CIV. PRAC. & REM. CODE § 101.060(a)(2))); *Westheimer Indep. Sch. Dist. v. Brockette*, 567 S.W.2d 780, 789-90 (Tex. 1978) (requiring a court to determine whether an appeal was "taken within a reasonable time" before exercising its appellate jurisdiction). Courts also determine whether a plaintiff acted within a "reasonable time" to cure any defects before reinstating a case after abating it for lack of capacity. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 853 n.7 (Tex. 2005).

22

expressed and implicit in the enacted language. In any event, though bright-line rules are coveted, "we cannot offer them at the expense of fulfilling legislative intent."[58]

Applying the plain meaning of "disapproves" in subsection (j) and the objectively implicit reasonable-time-to-perform standard in subsection (h), we hold that the LISD board disapproved Bellpas's amended petition[59] by not adopting a resolution approving it within a reasonable time after the February 2016 hearing.[60]

## D. A Split Decision

LISD also argues that, even if its board had "disapprove[d]" Bellpas's petition through inaction, there was no "split decision" to

---

[58] *Worsdale v. City of Killeen*, 578 S.W.3d 57, 76 (Tex. 2019).

[59] LISD asserts that because its school board received the amended petition only nine days before the February 2016 hearing, its board "couldn't even consider that petition at the hearing because it would constitute a violation of the notice requirement" and "those who could possibly be affected have a right to know and to speak on the matter." *See* TEX. EDUC. CODE §§ 13.003(e), .051(g) (requiring notice no later than ten days before the hearing). But Bellpas presented uncontroverted evidence that the LISD board did, in fact, consider the amended petition: Bellpas's president testified that he personally attended the hearing and it was on the "amended petition." LISD also admits that when its board received Bellpas's original petition, notice was timely provided for the scheduled LISD hearing. Given that the amended petition merely *decreased* the size of the affected territory, it defies logic that there were others with potentially affected rights who would not have been on notice. The greater already included the lesser.

[60] As we already noted, LISD did not introduce any evidence in the administrative proceedings on the reasonableness of its delay to adopt a resolution on Bellpas's amended petition, which continues to this day. LISD disputes whether it received a proper petition to trigger the statutory requirement to adopt a resolution and if the statute imposes any time constraint to do so. But it has not substantively challenged the Commissioner's finding and conclusion that a reasonable time had passed after the hearing without the LISD board adopting a resolution.

provide the Commissioner with jurisdiction under Section 13.051(j) over the appeal. According to LISD, "Bellpas made a split decision an impossibility" because the amended petition Bellpas submitted to the LISD board identified the total acreage as "348.55" while the amended petition Bellpas submitted to the CCISD board listed "335.83" as the total acreage. We disagree with LISD's premise.

As an initial observation, a stated total acreage of the affected territory is not only insufficient under our case law to satisfy the statutory scheme but also unnecessary.[61] Section 13.051 requires the petition to "give the metes and bounds of the territory to be detached and annexed," not the total acreage.[62]

The misstated total acreage was also a manifest error. The amended petition submitted to LISD expressly pointed the board to Appendix A, noting that the affected territory "consists of 348.55 acres of land *more particularly shown and described by* metes and bounds in

---

[61] *Mesquite Indep. Sch. Dist. v. Gross*, 67 S.W.2d 242, 243-44, 246 (Tex. [Comm'n Op.] 1934) (concluding that a petition describing the tracts by "the abstract number, certificate number, number of acres, and name of survey" failed to satisfy the statutory requirement to "[f]ully describ[e] by metes and bounds the territory proposed to be annexed"); *see Grand Lodge of the Order of the Sons of Hermann in Tex. v. Curry*, 108 S.W.2d 574, 575-76 (Tex. App.—San Antonio 1937, writ ref'd) (holding that a petition to annex territory to a water district failed to describe the metes and bounds when it listed only the total acreage "of 324 acres" and the specific farm numbers).

[62] TEX. EDUC. CODE § 13.051(b)(2). Our precedent has noted that the "generally accepted meaning" of "metes and bounds" in the annexation statutes is "the boundary lines and corners of the land sought to be annexed." *Curry*, 108 S.W.2d at 575-76 (describing annexation statutes for school and water districts); *see Metes and Bounds*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The territorial limits of real property as measured by distances and angles from designated landmarks and in relation to adjoining properties.").

Appendix A."[63] The map and field notes attached as Appendix A were the same in both amended petitions, describing the territorial limits of the area with the 12.72 acres carved out and clearly identifying the total acreage as "335.83" acres. By their express terms, both amended petitions requested the detachment and annexation of the same territory. The misstated total acreage in one was not only superfluous but also in conflict with the descriptions in Appendix A—what the statute and the petitions themselves identify as controlling.[64]

Of course, diligence should always be exercised to avoid typographical errors, even of the immaterial variety. Although we do not excuse any lack of care by Bellpas,[65] to err is human, and the appropriate response is charitable understanding, not procedural gamesmanship—especially from government officials as "the servant

---

[63] Emphasis added.

[64] General principles of interpretation also analogously lead to the same conclusion that the more specific metes-and-bounds description controls over the misstated total acreage. In the deed context, a metes-and-bounds description "is more specific and therefore better indicates the parties' intent" over a conflicting "call for acreage," "'the least reliable of all calls.'" *Stribling v. Millican DPC Partners, LP*, 458 S.W.3d 17, 21 (Tex. 2015) (quoting *Tex. Pac. Coal & Oil Co. v. Masterson*, 334 S.W.2d 436, 439 (Tex. 1960)); *see Cullers v. Platt*, 16 S.W. 1003, 1005 (Tex. [Comm'n Op.] 1891) ("[T]he rule is that, where there is a repugnance between a general and a particular description in a deed, the latter will control . . . . Where a grantor conveys specifically by metes and bounds, so there can be no controversy about what land is included and really conveyed, a general description . . . cannot control[.]").

[65] Bellpas's president testified that the error was an "overlooked" typographical error stemming from the total acreage listed in the earlier original petition. And LISD did not present any evidence, nor does the record indicate, that Bellpas's typographical error was intentional or in bad faith.

25

and not the master of the people."[66]  This is not just an ivory-tower admonishment; courts must frequently walk the walk, as even the best of us are not immune from making such mistakes.[67]  Indeed, we reaffirmed just last term that "'[t]his Court has never wavered from the principle' that 'the right of appeal should not be lost due to procedural technicalities.'"[68]

Consistent with this general principle, we hold that when materially identical petitions both include the same controlling description of the territory to be detached and annexed, an obvious (and obviously immaterial) typographical error misstating the total acreage does not bar a Section 13.051(j) appeal.  As the Commissioner correctly recognized, the amended petitions were "functionally identical" and

---

[66] TEX. GOV'T CODE § 552.001(a); *see* TEX. CONST. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit.").

[67] *See, e.g.*, *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 553 n.1 (Tex. 2022) (identifying "a typographical error in the certified question" from the United States Court of Appeals for the Fifth Circuit); *City of Amarillo v. Martin*, 971 S.W.2d 426, 428 n.1 (Tex. 1998) (inserting the word "not" into a statute when otherwise the "literal reading of the statute is patently absurd" and "the obvious legislative intent" was that the Legislature meant to include the "not"); *Villareal v. Steve's & Sons Doors, Inc.*, 139 S.W.3d 352, 354 (Tex. App.—San Antonio 2004, no pet.) (concluding that the listed effective date of a statute "contained in the Texas Supreme Court's decision in *Reyes* is a typographical error" (citing *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004))).

[68] *Chen v. Razberi Techs., Inc.*, 645 S.W.3d 773, 782 (Tex. 2022) (quoting *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex. 1997)); *see In re A.B.*, 676 S.W.3d 112, 116 (Tex. 2023) ("[W]e have repeatedly stressed that procedural rules should be construed and applied so that the right of appeal is not unnecessarily lost to technicalities." (quoting *Guest v. Dixon*, 195 S.W.3d 687, 688 (Tex. 2006))).

"essentially the same." The Commissioner therefore acquired jurisdiction over Bellpas's appeal from a split decision.

We also feel compelled to disapprove of LISD's actions, not through mere silence or inaction, but expressly. LISD strung Bellpas along for months without explaining its inaction or pointing out the typographical error LISD latched onto as a post hoc justification for its obvious stonewalling.[69] Had it done so, Bellpas could easily have corrected the error. Instead, LISD chose to play a game of procedural "gotcha" for no apparent purpose other than to obstruct a statutory right and prevent any review on the merits. These types of actions undermine the people's trust in government and waste limited governmental resources, including taxpayer dollars and the judiciary's time.

## E. Section 7.057(b)'s Deadline

As an alternative ground to affirm the court of appeals' dismissal, LISD raises Section 7.057(b)'s requirement that the Commissioner "shall, not later than the 180th day after the date an appeal under [s]ubsection (a) is filed, hold a hearing and issue a decision without cost to the parties involved."[70] We conclude that this deadline is not

---

[69] In oral argument before the court of appeals, LISD's counsel represented that the record is silent as to whether LISD told Bellpas before the administrative appeal of the discrepancy between the amended petitions but argued that "there isn't an obligation to do that under the statute." Bellpas's counsel responded by affirming that Bellpas was unaware of the typographical error until the administrative appeal was pending before the Commissioner.

[70] In the administrative proceedings, the parties disputed whether subsection (b)'s 180-day deadline or subsection (c)'s 240-day deadline applied. *See* TEX. EDUC. CODE §§ 7.057(b) (providing for a hearing before the Commissioner and imposing a 180-day deadline to issue a decision from "the date an appeal under [s]ubsection (a) is filed"), (c) (imposing a 240-day deadline in "an appeal against a school district" to "issue a decision based on a review

jurisdictional and that the Legislature did not intend dismissal as a judicially enforceable, nonjurisdictional consequence for noncompliance with that deadline. We leave open the possibility, however, that other judicially enforceable consequences may exist to compel the Commissioner to comply with his statutory duty to hold a hearing and issue a decision if he refuses to do so within the prescribed time.

Statutory requirements are presumed to be nonjurisdictional absent clear legislative intent to the contrary.[71] To discern legislative intent, we look to the statute's plain meaning, any specific consequences for noncompliance, the statute's purpose, and each construction's resulting consequences.[72] Section 7.057(b) imposes no specific consequences for noncompliance with the 180-day deadline. Agencies, however, may only exercise expressly granted and necessarily implied powers.[73] Relying primarily on the plain meaning of "shall" and the Code Construction Act's requirement that "shall" generally "imposes a duty,"[74] LISD argues that the Commissioner lost the specific power to issue a decision when the deadline passed.

---

of the record developed at the district level under a substantial evidence standard of review"), 13.051(j) (providing that a Section 13.051(j) appeal "under Section 7.057" is "de novo"). But in this Court the parties do not dispute subsection (b)'s application. Because our analysis applies to either deadline, we assume subsection (b) imposes the applicable deadline.

[71] *See In re J.S.*, 670 S.W.3d 591, 603 (Tex. 2023).

[72] *Tex. Mut. Ins. Co. v. Chicas*, 593 S.W.3d 284, 287, 290 (Tex. 2019).

[73] *Tex. Student Hous. Auth. v. Brazos Cnty. Appraisal Dist.*, 460 S.W.3d 137, 143 (Tex. 2015).

[74] TEX. GOV'T CODE § 311.016(2); *see AC Ints., L.P. v. Tex. Comm'n on Env't Quality*, 543 S.W.3d 703, 709 (Tex. 2018) ("The words 'shall' and 'must'

To infer from the use of a mandatory "shall" that the Legislature necessarily intended a specified deadline to be a jurisdictional limit precluding later agency action presumes too much. "[E]ven when there is no judicially enforceable consequence of a broken deadline, a mandatory deadline can still be both *mandatory* and far from pointless."[75] The Legislature may have intended to signal its expectations for the agency in the form of commands: directives "designed to promote the proper, orderly, and prompt conduct of business"[76] and "a spur to prompt action, not as a bar to tardy completion of the business."[77] And even if the Legislature intended there to be judicially enforceable consequences for noncompliance with a mandatory duty, "this does not mean that compliance is necessarily jurisdictional."[78]

Other considerations also point to the deadline being nonjurisdictional. The statute exists to provide for prompt review and resolution by the Commissioner to definitively settle a stalemate between school districts. But a jurisdictional construction could

---

in a statute are generally understood as mandatory terms that create a duty or condition.").

[75] *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022); *see Chicas*, 593 S.W.3d at 288 ("[S]trict compliance does not equate to a jurisdictional requirement."); *Igal v. Brightstar Info. Tech. Grp.*, 250 S.W.3d 78, 84 (Tex. 2008) (noting that a mandatory statutory requirement in the administrative context is not necessarily jurisdictional).

[76] *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 362 (Tex. 1983).

[77] *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 172 (2003).

[78] *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 494 (Tex. 2001).

(1) harm aggrieved appealing parties for delay that may be outside their control, (2) promote gamesmanship to intentionally delay proceedings, and (3) leave untimely administrative decisions subject to future attack,[79] with students potentially seesawed between school districts. A nonjurisdictional construction, on the other hand, would likely cause minimal disruption by merely perpetuating the status quo during any delay.[80] Generally, a late decision on the merits is better than never,[81] and unlawful bureaucratic delay should not rob an appealing party and the public—including students—of both administrative and judicial review when boards disagree on detachment and annexation.

---

[79] *Chicas*, 593 S.W.3d at 289; *see City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex. 2009) (rejecting the argument that the possibility of a future attack on a judgment for lack of subject-matter jurisdiction is not present in the administrative context).

[80] In *Garza v. Texas Alcoholic Beverage Commission*, we concluded that because a statute created an "absolute deadline for rendition of judgment" in an appeal of a liquor-license denial, "district courts have no power to render judgment or entertain post-judgment motions after expiration of the ten-day period." 89 S.W.3d 1, 6 (Tex. 2002). But *Garza*'s statutory construction relied heavily on the potential detriment to the public welfare of a nonjurisdictional construction. *Id.* at 5 (noting that if the deadline was not an "absolute deadline," "a business could continue operating more than ten days after the appeal is filed even when (as here) a county court has concluded that the business imperils the general welfare, health, peace, morals, and safety of the people"). Here, in contrast, the resulting consequences weigh in favor of a nonjurisdictional construction.

[81] *See United States v. Dolan*, 571 F.3d 1022, 1027 (10th Cir. 2009) ("Call this the better-late-than-never principle. Congress imposes deadlines on other branches of government to prod them into ensuring the timely completion of their statutory obligations to the public, not to allow those branches the chance to avoid their obligations just by dragging their feet. It would be a strange thing indeed if a bureaucracy or court could avoid a congressional mandate by unlawful delay."), *aff'd*, 560 U.S. 605 (2010).

For similar reasons, we also conclude that the Legislature did not intend dismissal as a judicially enforceable, *nonjurisdictional* consequence. Although the parties frame the issue as whether the use of "shall" indicates that the 180-day deadline is "mandatory" or merely "directory," "[t]hese labels are somewhat misleading."[82] "More precisely, the issue is not whether 'shall' is mandatory, but what consequences follow a failure to comply."[83]

When the Legislature intends dismissal as a consequence, it generally says so.[84] Here, it did not. And dismissal is not a "logically necessary" consequence for the Commissioner's noncompliance with this provision.[85] Dismissal as a consequence not only lacks textual support but also would eviscerate the statute's purpose, depriving the aggrieved appealing party of any—let alone prompt—review and resolution by the Commissioner.[86]

---

[82] *State v. $435,000.00*, 842 S.W.2d 642, 644 (Tex. 1992).

[83] *Id.*; *see AC Ints., L.P. v. Tex. Comm'n on Env't Quality*, 543 S.W.3d 703, 709-10 (Tex. 2018) ("It is too quick to say that 'must' is mandatory language, therefore failure to comply results in dismissal.").

[84] *Hogan v. Zoanni*, 627 S.W.3d 163, 170 (Tex. 2021) (plurality op.); *see State*, 842 S.W.2d at 644 ("If the Legislature had intended dismissal to be the consequence of a failure to hear a forfeiture case within the prescribed period, it could easily have said so[.]").

[85] *AC Ints.*, 543 S.W.3d at 711 (noting that generally when a statute does not state a consequence for a nonjurisdictional requirement, "no consequence is logically necessary").

[86] *See id.* at 713 ("[W]hen the statute is otherwise silent on the subject, we look to its purpose for guidance in divining the consequence for noncompliance. . . . [I]f a particular consequence is logically necessary to accomplish the statute's purpose, the courts will apply that consequence."); *State*, 842 S.W.2d at 644 ("It does not follow, however, that if a trial court is

"[N]o government official should ever feel free to disregard a statutory deadline or any other statutory command."[87]  When the law commands, the commands are law, whether they are categorized as jurisdictional, mandatory, or merely directory.[88]  Although we have concluded that this statutory scheme does not provide for dismissal as a judicially enforceable consequence for the Commissioner's noncompliance with the deadline, other consequences—if consistent with the constitutional separation of powers[89]—may exist to compel the Commissioner to hold a hearing and issue a decision.[90]

But the availability of any possible consequences for continued noncompliance is for another day.  The Commissioner eventually complied with his duty to issue a decision on the merits, even if untimely.  LISD did not.  Nor did LISD seek a remedy in the administrative proceedings to compel the Commissioner to promptly

required by statute to hear a forfeiture case within 30 days of the filing of the answer and does not do so, it cannot hear the case at all and must dismiss it.").

[87] *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022).

[88] *Id.* at 295 ("[C]ommands [to act within a stated time] are part of *the law*; whether they prescribe a consequence, and whether they are characterized as 'mandatory' or 'directory,' they are not mere suggestions to be disregarded.").

[89] *See id.* at 297 ("[D]evising ways to judicially 'enforce' a duty can risk supplanting the legislature because it is primarily for the legislature to determine how far it is worth pressing to achieve compliance with its own statutory directives.").

[90] *Cf. State*, 842 S.W.2d at 644 ("The mandatory provision affords the parties the right to compel the trial court to hear the case promptly.  If a trial court refuses, the statute provides a basis for relief by mandamus, but not for dismissal.").

conduct the hearing and issue a resolution.[91] On this issue, LISD merely sought—as it does now—to avoid any decision on the merits by requesting dismissal. To conclude that Bellpas is not entitled to a decision on the merits of its detachment-and-annexation petition due to delay in the administrative-appeal process would be just as incompatible with the statutory scheme as allowing LISD's school board to evade its duty to provide a decision by simply refusing to do so.

### III. Conclusion

We reverse the court of appeals' judgment. Our disposition on these jurisdictional issues now requires the merits of the Commissioner's decision to be reviewed. Consistent with our usual practice and as a reviewing court of last resort—not of first view—we decline to consider these nonjurisdictional questions in the first instance.[92] We remand the case to the court of appeals for further proceedings consistent with this opinion.

John P. Devine
Justice

**OPINION DELIVERED:** February 16, 2024

---

[91] To the contrary, LISD jointly requested a deadline extension and then promptly argued the extension divested the Commissioner of jurisdiction.

[92] *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 870 (Tex. 2023) ("[T]he law is typically better served when the lower courts review a legal issue before this Court does. 'Ours is a court of final review and not first view.'" (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012))).